**WITTELS MCINTURFF PALIKOVIC**
Daniel J. Kieselstein
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    914-775-8862
djk@wittelslaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHARLES GREENWOOD,**<br><br>On Behalf of Himself and All Others Similarly Situated,<br><br>**Plaintiff,**<br><br>v.<br><br>**EXPRESS VPN INTERNATIONAL LTD. d/b/a EXPRESS TECHNOLOGIES LIMITED**,<br><br>**Defendant.** | Case No.: 1:25-cv-08121<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Charles Greenwood ("Plaintiff"), by his undersigned attorneys Wittels McInturff Palikovic, brings this consumer protection action in his individual capacity and on behalf of a class of Illinois consumers defined below against Defendant Express VPN International Ltd. d/b/a Express Technologies Limited (hereinafter, "ExpressVPN," "Defendant," or the "Company") and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

**INTRODUCTION**

1.      This proposed class action lawsuit challenges ExpressVPN's use of deceptive and illegal "automatic renewal" tactics to trick consumers into paying for unwanted subscriptions for internet privacy and security products and services ("ExpressVPN Subscriptions"). ExpressVPN intentionally misleads consumers into thinking that they can subscribe for a discrete period of time. The truth, however, is that ExpressVPN Subscriptions automatically renew and the Company's "disclosures" regarding the ongoing charges are hidden from consumers both before and after purchase. ExpressVPN's enrollment and post-purchase practices therefore violate the Illinois Automatic Contract Renewal Act (815 ILCS 601/1 *et seq.*, ("Illinois ARL")) and the common law. Further, ExpressVPN intentionally makes the ExpressVPN Subscriptions difficult to cancel. This too violates the Illinois ARL and the common law.

2.      ExpressVPN offers a suite of products and services to consumers that claim to provide internet users with privacy and protection from cybersecurity threats. Those offerings include a virtual private network ("VPN") service called "ExpressVPN,"[1] a password manager called "ExpressVPN Keys," and a router with a built-in VPN service called "Aircove."

---

[1] A VPN service is one that purports to protect a user's internet connection and online privacy. These services typically route a user's internet traffic through an encrypted tunnel to a server in

3.     Potential customers are directed to ExpressVPN's website through online searches, its sponsorship of influencers, or the Company's advertising. ExpressVPN advertises widely online and on numerous podcasts. ExpressVPN's advertising touts the benefits that its services allegedly offer the prudent consumer; for example, the Company claims that its VPN is the "[w]orld's #1 premium VPN" with "[b]est-in-class encryption" and touts what "tech experts" (which are actually news websites like Business Insider and U.S. News & World Report) "are saying about ExpressVPN."

4.     But while consumers enroll in ExpressVPN Subscriptions for better privacy and security, Defendant is actually collecting consumers' payment information and hard-earned money via deceptive and unlawful subscription practices. These practices are intentionally designed to trick consumers into paying unwanted subscription fees. Indeed, that is exactly what happened here, where Plaintiff enrolled in an ExpressVPN Subscription that he did not know would automatically renew and was then charged for multiple additional years of an ExpressVPN Subscription that he did not want.

5.     ExpressVPN Subscriptions use a "negative option" billing tactic, which the Consumer Financial Protection Bureau ("CFPB") defines as "a term or condition under which a seller may interpret a consumer's silence, failure to take an affirmative action to reject a product or service, or failure to cancel an agreement as acceptance or continued acceptance of the offer."[2]

---

another location, masking the user's location and protecting the user's data from interception along the way. Uses for VPNs range from casual entertainment (*i.e.*, using a VPN while abroad to watch a show that is only available in the U.S.) to the distribution of politically significant information (*i.e.*, masking journalistic sources within a totalitarian regime).

[2] Consumer Financial Protection Circular 2023-01, Unlawful negative option marketing practices (Jan. 19, 2023), https://files.consumerfinance.gov/f/documents/cfpb_unlawful-negative-option-marketing-practices-circular_2023-01.pdf.

As the CFPB cautions, "[n]egative option programs can cause serious harm to consumers," which "is most likely to occur when sellers mislead consumers about terms and conditions, fail to obtain consumers' informed consent, or make it difficult for consumers to cancel."[3]

6.      Due to the Company's deceptive and unlawful negative option practices, consumers who sign up for ExpressVPN's product offerings, including ExpressVPN, ExpressVPN Keys, and Aircove, ultimately end up being illegally charged for ExpressVPN Subscriptions.

## THE UNIFORM WEB OF EXPRESSVPN'S NEGATIVE OPTION SCHEME

7.      ExpressVPN traps consumers into unintended purchases with a web of deceptive online design features that exploit well-known shortcomings in consumer decision-making. The paragraphs below describe the various deceptive strategies ExpressVPN employs in the structure of its offerings. While each of these deceptive strategies is independently sufficient to trick consumers into making inadvertent purchases, taken together these components form an intentionally deceptive architecture that is designed to, and does, produce an unlawful outcome: saddling unwitting consumers with illegal subscriptions.

8.      ExpressVPN deceives consumers in at least three ways.

9.      First, during the enrollment process, ExpressVPN misleads consumers regarding the fact that ExpressVPN Subscriptions automatically renew, the terms of any such automatic renewal, and the cancellation policy that applies to ExpressVPN's offer. For example, instead of clearly explaining to the consumer what they are actually getting into, ExpressVPN offers consumers what appear to be time-limited plans and withholds the relevant (and inadequate) terms that reveal otherwise. ExpressVPN waits until a customer reaches the payment step in its sign-up process and then buries a purported (and inadequate) "disclosure" regarding its recurring fees in a

---

[3] *Id*. at 2.

drop-down feature designed in a way such that customers overlook it. Instead of alerting consumers to obtain their informed and affirmative consent to automatic renewal prior to charging their payment cards or third-party payment accounts, ExpressVPN hides the truth.

10.     Second, ExpressVPN's scheme continues post-sign-up. ExpressVPN's acknowledgement emails sent to consumers after they enroll in an ExpressVPN subscription contain no information whatsoever on how to cancel an ExpressVPN subscription.

11.     Third, ExpressVPN makes canceling ExpressVPN Subscriptions exceedingly difficult. Customers must figure out—on their own—that canceling requires navigating an unnecessarily long and intentionally confusing process that requires at least six separate actions across at least seven different pages on the Company's website including navigating to their ExpressVPN account, finding a link to the "Subscriptions" page, and finding two additional de-emphasized links. Then, when it appears that consumers have canceled their ExpressVPN Subscription, they encounter multiple pages that masquerade as a routine post-cancellation survey but are in fact a further deceptive step required to finally cancel.

12.     All ExpressVPN customers face the same gauntlet and need only be tricked by one of ExpressVPN's traps to end up paying a hefty fee for an unwanted subscription.

13.     It is not happenstance that ExpressVPN's customers are paying for illegal subscriptions. This outcome is the result of ExpressVPN's intentional and bad-faith design choices. ExpressVPN is well aware that its scheme is tricking customers, as complaints about ExpressVPN are legion, with hundreds of consumers complaining directly to ExpressVPN or via sites like Trustpilot, SiteJabber, and Reddit. Upon information and belief, ExpressVPN experiences a high rate of chargebacks when consumers, frustrated by ExpressVPN's subscription scheme, initiate disputes through their credit card companies or other payment processors over

unwanted ExpressVPN transactions. Indeed, ExpressVPN devotes an entire section of its Terms of Service to dealing with chargebacks by consumers. Upon information and belief, ExpressVPN has developed customer service protocols for dealing with customers complaining about unwanted subscription charges.

14.     Nevertheless, despite the clear messages ExpressVPN's customers are sending, ExpressVPN continues to subject consumers to its unlawful subscription scheme and reap significant monetary benefits from its improper conduct.

15.     Only through a class action can consumers like Plaintiff remedy ExpressVPN's unlawful practices. Because the monetary damages suffered by each customer are small in comparison to the much higher cost a single customer would incur in trying to challenge ExpressVPN's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit. With this class action, Plaintiff and the Class seek to level the playing field, enjoin ExpressVPN's unlawful business practices, and recover the charges ExpressVPN has imposed on them in violation of the law.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Defendant because it conducts substantial business in Illinois, has sufficient minimum contacts with this state, and otherwise purposely avails itself of the privileges of conducting business in Illinois by marketing and selling products and services in Illinois, including through an interactive website through which ExpressVPN conducts business aimed at Illinois consumers and ExpressVPN servers located in Illinois. Further, the injuries to Illinois consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from ExpressVPN's continuing conduct in Illinois, including, but not limited to, directing its subscription scheme at Illinois consumers.

17.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and ExpressVPN.

18.     This Court has original subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act. However, if the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3). Defendant is a foreign corporation and may be sued in any judicial district in the United States. *Id.*

## PARTIES

20.     Plaintiff Charles Greenwood is a citizen of Illinois.

21.     Plaintiff is a consumer who was victimized by ExpressVPN's unlawful subscription scheme, suffered ascertainable injury in fact, and lost money because of ExpressVPN's violations of consumer protection statutes and the common law.

22.     Defendant Express VPN International Ltd. d/b/a Express Technologies Limited is a British Virgin Islands ("BVI") corporation incorporated under the laws of the BVI. Defendant's principal place of business is in the BVI.

23. ExpressVPN's corporate parent is Kape Technologies, Plc, which purchased ExpressVPN for $938 million on September 3, 2021.[4] Kape Technologies, Plc is headquartered in the United Kingdom.[5]

24. Kape Technologies is 98.63% owned by Unikmind Holdings Ltd., a holding company incorporated in the BVI in 2014, but since redomiciled in the Isle of Man on January 15, 2019. Unikmind Holdings Ltd. is wholly owned by billionaire Teddy Sagi.[6]

## FACTUAL ALLEGATIONS

### A. Background on the Subscription e-Commerce Industry

25. The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[7] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, the popularity of subscription e-commerce has grown rapidly in recent years. Indeed, as of 2022 the "subscription economy ha[d] grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[8]

---

[4] Kape Technologies buys ExpressVPN for $938 mln, REUTERS, https://www.reuters.com/technology/kape-technologies-buys-expressvpn-936-mln-2021-09-13/.

[5] Contact Us, KAPE TECHNOLOGIES, https://www.kape.com/contacts/.

[6] About Us, UNIKMIND HOLDINGS LIMITED, https://unikmind-holdings.com/.

[7] See Sam Saltis, How to Run an eCommerce Subscription Service: The Ultimate Guide, CORE DNA, https://www.coredna.com/blogs/ecommerce-subscription-services.

[8] Mary Mesienzahl, Taco Bell's taco subscription is rolling out nationwide — here's how to get it, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

26. In March 2023, one source noted that "[o]ver the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[9]

27. The expansion of the subscription e-commerce market shows no signs of slowing. According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last."[10] 68% of consumers subscribed to something for the first time in 2024.[11]

28. However, the subscription-based business model also has well-documented downsides. While the subscription e-commerce market has low barriers to entry, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[12] In particular, retailers struggle with the fact that "[c]hurn

---

[9] *The Subscription Economy Index*, ZUORA (Mar. 2023), https://www.zuora.com/wp-content/uploads/2023/03/Zuora_SEI_2023_Q2.pdfhttps://www.zuora.com/resources/subscription-economy-index/.

[10] Heather Long and Andrew Van Dam, *Everything's becoming a subscription, and the pandemic is partly to blame*, WASHINGTON POST (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.

[11] Tien Tzuo, *They said subscriptions were doomed. The market said otherwise.*, ZUORA (Mar. 6, 2025), https://www.zuora.com/subscribed/they-said-subscriptions-were-doomed-the-market-said-otherwise.

[12] Tony Chen, *et al.*, *Thinking inside the subscription box: New research on e-commerce consumers*, MCKINSEY & COMPANY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[13]

29.     Retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[14] As these companies have realized, "[t]he real money is in the inertia."[15] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[16] That is, to garner more revenue, some companies, including ExpressVPN, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with their app's design and flow, . . . and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[17]

30.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a

---

[13] *Id.*

[14] Amrita Jayakumar, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[15] *Id.*

[16] Zoe Schiffer, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want*, BUSINESS INSIDER (June 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

[17] Sarah Perez, *Sneaky subscriptions are plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store.

subscription marketing plan."[18] Indeed, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to combat aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[19] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts, [and are] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[20] widespread utilization of these misleading "dark patterns" and deliberate omissions persist.

31.     The term "dark patterns" used herein is not a science fiction reference, but a term of art from the field of user experience ("UX"). The International Organization for Standardization defines UX as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[21] Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[22]

---

[18] Heather Long and Andrew Van Dam, *supra* note 10 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also The problem with subscription marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing.

[19] Heather Long and Andrew Van Dam, *supra* note 10.

[20] *Id.*

[21] *User Experience (UX): Process and Methodology*, UIUX TREND, https://uiuxtrend.com/user-experience-uxprocess/.

[22] Joey Ricard, *UX Dark Patterns: The Dark Side Of The UX Design*, KLIZO SOLS. PVT. LTD. (Nov. 9, 2020), https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design.

32.     The term "dark patterns" was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology. In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[23] The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[24] The image below provides some examples of commonly employed dark patterns:[25]



---

[23]  Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

[24] *Id.*

[25] Sarbashish Basu, *What is a dark pattern? How it benefits businesses- Some examples*, H2S MEDIA (Dec. 19, 2019), https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

33. The origin of dark patterns can be traced to the use of applied psychology and A/B testing in UX.[26] In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking. The image below provides examples of cognitive biases, including some that ExpressVPN employs in its cancellation process:[27]



---

[26] Brignull, *supra* note 23.

[27] Krisztina Szerovay, *Cognitive Bias — Part 2*, UX KNOWLEDGE BASE (Dec. 19, 2017), https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.

34.     But while the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler (authors of the noted book *Nudge*) shifted focus and made the policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[28]

35.     Another step in the development and application of such research is the use of A/B testing in UX. A/B testing is a quantitative research method that presents an audience with two variations of a design and then measures which actions they take (or do not take) in response to each variant.[29] UX designers use this method to determine which design or content performs best with the intended user base.[30] For example, a large health care provider might A/B test whether a website visitor is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

36.     Unscrupulous UX designers have subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermine consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly "effective" user interfaces that deceive consumers in ways that are more profitable to the company applying them.[31] For example, dark patterns can be used to increase a company's

---

[28] Arvind Narayanan *et al*., *Dark Patterns: Past, Present, and Future. The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91 (2002), https://queue.acm.org/detail.cfm?id=3400901.

[29]     UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/ab-testing-in-ux-design-when-and-why.

[30] *Id.*

[31] Narayanan *et al*., *supra* note 28.

ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, hand over more personal information, or see more ads.[32]

37.     ExpressVPN has engaged in these unlawful subscription practices with great success. In 2021, ExpressVPN was purchased by Kape Technologies, Plc for $938 million.[33] As of January 24, 2023, ExpressVPN's products and services had over 4 million subscribers.[34]

**B.     ExpressVPN's Material Misrepresentations and Omissions in Its Enrollment Process**

38.     ExpressVPN has unique access to its historical ordering pages (including when Plaintiff enrolled). The current version of ExpressVPN's ordering page is reproduced on the following page:

---

[32] *Id.*

[33]     Kape     Technologies     buys     ExpressVPN     for     $938     mln,     REUTERS, https://www.reuters.com/technology/kape-technologies-buys-expressvpn-936-mln-2021-09-13/.

[34]     We've     reached     4     million     active     subscribers!,     EXPRESSVPN     NEWS, https://www.expressvpn.com/blog/4-million-subscribers/?srsltid=AfmBOorXCol9Z2uYi90j-At1A6SDr0ver1ncx4gWADxaURhbjtOu0dEl.



39. This page uses several dark patterns to obscure what prospective customers are getting into.

40. First, it uses the "obscured pricing" dark pattern, *supra* ¶ 32, by presenting three distinct offers to the consumer. The page is designed to grab the consumer's attention, using 6 different colors and a variety of font sizes to steer the user towards the longest-term plan.

41. Second, the monthly prices are in large, bolded font compared to the rest of the text on the page, which implies that consumers will be charged on a monthly basis. In reality, consumers are charged the full amount upfront. Although unclear, this is inferred by the light grey fine print text on a white background below the monthly price.

15

42.     Third, the total price contains hidden extra charges. For example, ExpressVPN offers a plan for "2 Years + 4 Months FREE" for $4.99 per month. $4.99 multiplied by 24 months is $119.76. But ExpressVPN's plan costs $139.72 instead, which is $4.99 multiplied by 28 months. In other words, ExpressVPN does not offer *any* free months, but tells consumers it does. This is the "hidden costs" dark pattern, *supra* ¶ 32.

43.     Having selected a plan, the consumer is then prompted to enter their email address. At this point, ExpressVPN has still not provided the user with any notice of its autorenewal provision.

44.     The consumer then continues with a set of drop-down menus from which the user must select a payment method:



45.     When a consumer selects a payment method on the payment screen (*e.g.*, credit card, PayPal, etc.), the payment method box expands, the terms and conditions of ExpressVPN's automatic renewal are at last disclosed to the consumer—in tiny gray font atop a similarly colored background, as reproduced on the following page:



46. The terms and conditions of ExpressVPN's automatic renewal offer are not presented clearly and conspicuously. The automatic renewal language is not in larger type than the surrounding font, but instead notably smaller than the "Subscribe Now" button. Instead, it is colored light gray rather than a more conspicuous color and is not set off from the surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language. These intentional design choices by ExpressVPN violate the Illinois ARL. *See* 815 ILCS § 601/10 (West 2004) (requiring companies like ExpressVPN to "disclose the automatic renewal clause clearly and conspicuously"); *see also* 815 ILCS § 601/5 ("'Clear and conspicuous' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a

manner that clearly calls attention to the language.").

47.    Instead, the payment page's overall design, including the location of ExpressVPN's supposed "disclosure" regarding automatic renewal, its font size, and color, *deemphasize* the notice text rather than make it ***conspicuous***. This makes it unlikely that reasonable consumers will even see the supposed "disclosures" because they are presented in a light grey font against a white background, which makes the "disclosures" difficult to read.

48.    Defendant's fine print also fails to disclose key details about ExpressVPN's subscription practices, including the cancellation procedure.

49.    Moreover, any supposed "disclosures" on the ExpressVPN payment page are far overshadowed by the page's other components in a clear demonstration of the "Misinformation" dark pattern. ExpressVPN's payment page uses at least 15 different colors, presents information in fonts of different sizes and in various boxes, and includes hyperlinks, drop-down menus styled as hyperlinks, two call-outs for add-on products, and 15 different logos. In contrast, the automatic renewal terms are withheld until the consumer opens the payment box, displayed in colors that are difficult to discern and that do not stand out from the surrounding text, and are easy to miss due to their miniscule size.

50.    When a consumer selects a payment method on the payment screen (*e.g.*, credit card, PayPal, etc.), the payment method box expands, again failing to disclose ExpressVPN's autorenewal terms, let alone in a clear and conspicuous manner. The expanded payment boxes also do not present the consumer with any disclosure of the cancellation policy or a remotely adequate explanation of the steps required to cancel an ExpressVPN Subscription, let alone provide a cancellation method that is retainable by consumers and is cost-effective, timely, and easy-to-use.

51.     ExpressVPN's "Order Summary" box likewise does not sufficiently present the terms and conditions of its automatic renewal offer to consumers, nor does it present the consumer with ExpressVPN's cancellation procedure.

52.     In sum, ExpressVPN's payment page does not clearly and conspicuously disclose the terms of its automatically renewing subscription. And due to this deficient disclosure, ExpressVPN fails to obtain affirmative consent.

53.     Nowhere on the payment page does ExpressVPN disclose critical information regarding cancellation, such as adequate instructions on how to cancel the ExpressVPN Subscription and/or turn off autorenewal, and ExpressVPN certainly does not clearly and conspicuously disclose how to do so in a manner that is capable of being retained by the consumer. This too violates the Illinois ARL. *See* 815 ILCS 601/10(a) (West 2004) (requiring companies like ExpressVPN to disclose "the cancellation procedure" for the subscription "clearly and conspicuously"); *see also* ILCS 601/10(a)(i)–(iii) (same).

54.     After a customer has enrolled in an ExpressVPN Subscription, ExpressVPN sends them an email with the subject line "Welcome to ExpressVPN." An example of an acknowledgement email is reproduced on the following page:



55.     ExpressVPN's post-enrollment acknowledgement email does not meet the Illinois ARL's post-purchase requirements. It does not provide "the automatic renewal offer terms, cancellation policy, and information regarding how to cancel" for ExpressVPN Subscriptions, ILCS 601/10(a)(iii), nor disclose "how to cancel" the renewal "before the subscription or purchasing offer is fulfilled" for an ExpressVPN Subscription, *id.* § 601/10(a)(i). In fact, the email

does not include any disclosure whatsoever about how to cancel an ExpressVPN Subscription.

56.     Moreover, ExpressVPN's acknowledgement email does not disclose that the automatic renewal will automatically renew unless the consumer cancels, or provide a "cost-effective, timely, and easy-to-use mechanism for cancellation" that is described in the acknowledgement email. *Id.* § 601/10(a)(iii); § 601/10(b-5).

**C.     ExpressVPN's Cancellation Process Violates the Illinois ARL**

57.     ExpressVPN's cancellation process is not simple, cost-effective, timely, or easy-to-use. ExpressVPN also does not provide details about its subscription cancellation process that are capable of being retained by consumers. Instead, ExpressVPN employs the "roach motel" dark pattern strategy: it is easy to get into an ExpressVPN Subscription, but hard to get out.

58.     ExpressVPN buries its cancellation mechanism *six* layers deep on its website, with no clear path evident to the consumer for how to get there. Canceling an ExpressVPN Subscription requires consumers to navigate to the Company's home page, and (1) click on a "My Account" button in small print at the top of the home page, as reproduced on the following page:



59.     Once the consumer has reached the "My Account" page, they must (2) log into their account and then select "Subscription" from a list of at least eleven options. ExpressVPN's My Account page is reproduced below:



60.     The default view of the "Subscriptions" page does not mention anything about cancellation, but shows large, colorful suggestions to "make full use of your subscription" and encourages consumers to add devices to their account. Next, consumers must (3) find and navigate

to the small, lightly colored link reading "Edit subscription settings." ExpressVPN's

"Subscription" page is reproduced in the two screenshots below:



61. Customers who access the "Edit my subscriptions" page are still not presented with

a clear "Cancel" option. Instead, they are taken to a page with a prominent link to "See Cheaper

Plans," followed by another series of large, brightly colored logos advertising various additional

supposed "benefits" that accompany an ExpressVPN Subscription. Tucked in between these

prominent features is a small, light green link reading "turn off automatic renewal." Consumers must (4) find and then click this link.



62.     But clicking that link **still** does not effectuate cancellation. Instead, consumers are taken to yet another page with the heading "Why would you like to cancel?":



63.     This page does not include any link or button labelled "Cancel," "Turn Off Autorenewal," or similar language. Instead, consumers must infer that they have to (5) justify their

decision to cancel from a pre-selected list of reasons. This page does not inform consumers that they have not canceled the subscription without clicking through what looks like an optional post-cancellation survey, nor that this is yet another step in ExpressVPN's convoluted, seemingly interminable cancellation process—indeed, ExpressVPN provides no instruction whatsoever. This page, a typical "Roadblock" dark pattern, is designed to obstruct the consumer's intended action. *See supra* ¶ 32.

64.     Consumers who do select a choice on the "Why would you like to cancel?" page, are taken to yet another page, which, depending on the reason the consumer chose, leads off with a large and brightly colored advertisement purportedly seeking to address the cancellation reason. A few examples are reproduced below and on the following page:







65. The large, brightly colored logos and links around which each of these pages are centered draw the consumer's attention away from their intended action of canceling their subscription. This is an example of the "deliberate misdirection" dark pattern. *See supra* ¶ 32.

66. Beneath the brightly colored logo and placed last in reading order among three choices, the consumer is presented with a "Cancel Now" button. Clicking this button is the (6) *sixth* and final step to finally cancel an ExpressVPN Subscription.

67. In sum, ExpressVPN's multi-step cancellation process is specifically and intentionally designed to thwart cancellation—a "roach motel" dark pattern—that prevents consumers from finding and canceling autorenewal. This "roach motel" dark pattern is made more effective—and thus more frustrating to the consumer's purpose—through ExpressVPN's willful deployment of additional dark patterns, including roadblocks and deliberate misdirection. ExpressVPN's cancellation process violates the ARL because it is not cost-effective, timely, or easy-to-use. ILCS 601/10(b), (b-5).

68. Nor does ExpressVPN provide consumers with a toll-free telephone number or electronic mail address for consumers to cancel the automatic renewal. In fact, on information and belief, customers who do contact ExpressVPN customer support to cancel autorenewal are directed to the Company's website rather than being permitted to cancel through customer service. ExpressVPN's requirement that consumers use its confusing, six-step cancellation process even after contacting customer service further confirms that its use of the "roach motel" dark pattern is deliberate and designed to thwart cancellations.

69. For those consumers who use ExpressVPN's mobile application, like Plaintiff, there is no way in which to cancel autorenewal. This too violates the Illinois ARL. *Id.*

**D.    How ExpressVPN's Subscription Scheme Injured Plaintiff**

70.    Plaintiff was injured by ExpressVPN's unlawful and deceptive subscription scheme because had Plaintiff known that he was enrolling in an automatically renewing subscription, he would not have enrolled in an ExpressVPN Subscription.

71.    On approximately May 8, 2020, Plaintiff enrolled in a one-year subscription to ExpressVPN's VPN product offering for $99.95.

72.    Plaintiff decided he did not want to continue with ExpressVPN after his one-year plan ended.

73.    Having decided not to continue with ExpressVPN, Plaintiff believed that once his plan period was over, he would no longer be an ExpressVPN customer. Indeed, Plaintiff never expected to pay ExpressVPN anything beyond what he had already paid in May 2020 because ExpressVPN did not adequately disclose to Plaintiff that it would begin charging non-refundable recurring annual fees after his initial one-year subscription ended.

74.    Nonetheless, on or about May 17, 2021, ExpressVPN charged Plaintiff's credit card $99.95 without his knowledge or permission for a one-year ExpressVPN subscription set to begin on or about May 17, 2021.

75.    Express VPN charged Plaintiff's credit card without his knowledge or permissions for a one-year ExpressVPN subscription three subsequent times, for $99.95 on or about May 23, 2022, for $99.95 on or about May 23, 2023, and for $116.95 on or about May 23, 2024.

76.    After the first unauthorized charge to Plaintiff's credit card in May 2021, Plaintiff searched for information on the internet about how to cancel the unauthorized subscription but was unable to do so. Plaintiff also downloaded the ExpressVPN mobile application to attempt to cancel the unauthorized subscription but was unable to do so.

77.     At some point after the fourth unauthorized renewal charge, Plaintiff was finally able to cancel autorenewal of his ExpressVPN Subscription.

78.     ExpressVPN did not "clearly and conspicuously" disclose to Plaintiff that it would automatically renew his ExpressVPN Subscription for a one-year term after his initial one-year plan expired. This information is not clearly and conspicuously provided in the contract offers made on ExpressVPN's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email.

79.     Similarly, ExpressVPN did not "clearly and conspicuously" disclose to Plaintiff how he could cancel his ExpressVPN Subscription. This information is not clearly and conspicuously provided in the contract offers made on ExpressVPN's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email.

80.     Plaintiff did not authorize or want his ExpressVPN Subscription to renew once, let alone four times.

81.     Plaintiff was injured when ExpressVPN charged his credit card $99.95 three times and $116.95 once, for a total of $416.80, for an ExpressVPN Subscription he did not want and did not want to pay for.

82.     Plaintiff was further injured by ExpressVPN's subscription scheme because had he known the truth about ExpressVPN's intentionally misleading subscription practices, he would not have enrolled in an ExpressVPN Subscription.

83.     Plaintiff intends to purchase products and services in the future for himself from internet security companies, including ExpressVPN, as long as he can gain some confidence in ExpressVPN's representations about its products and services and subscription practices,

including autorenewal and cancellation. Moreover, ExpressVPN still has Plaintiff's payment information and could use it to process unauthorized payments in the future.

84.    Given that ExpressVPN has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of ExpressVPN's last wrongful act against Plaintiff, which was in May 2024, when ExpressVPN last charged Plaintiff for an automatically renewing subscription he did not want and did not want to pay for.

85.    ExpressVPN deceived Plaintiff into believing that once his one-year plan period was over, he would no longer be subscribed to ExpressVPN.

### RULE 9(B) ALLEGATIONS

86.    To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

87.    **WHO**: Defendant sells services to consumers in Illinois through a deceptive subscription scheme by making the material misrepresentations and omissions alleged in detail above in violation of consumer protection statutes and the common law, including with respect to automatic renewal and cancellation, leaving many consumers who sign up for an ExpressVPN product offering paying for subscriptions that they do not want.

88.    **WHAT**:

- ExpressVPN conducts its deceptive subscription scheme by failing to clearly and conspicuously disclose the Company's terms and conditions to customers, including how to cancel a subscription. For example, instead of clearly explaining to the consumer what they are actually getting into, ExpressVPN offers consumers what appear to be time-limited plans and withholds the relevant (and inadequate) terms that reveal otherwise. ExpressVPN waits until a customer reaches the payment step in its sign-up process and then buries a purported (and inadequate) "disclosure" regarding its recurring fees in a drop-down

feature that customers are intended to overlook. Instead of alerting consumers to obtain their informed and affirmative consent to automatic renewal prior to charging their payment cards or third-party payment accounts, ExpressVPN hides the truth.

- ExpressVPN conducts its deceptive subscription scheme by failing to include any information whatsoever on how to cancel an ExpressVPN Subscription in its acknowledgement emails sent to consumers.

- ExpressVPN conducts its deceptive subscription scheme by subjecting ExpressVPN customers to an exceedingly difficult cancellation process that requires consumers to figure out—on their own—that canceling requires navigating an unnecessarily long and intentionally confusing process that requires at least six separate actions across at least seven different pages on the Company's website including navigating to their ExpressVPN account, finding a link to the "Subscriptions" page, finding two additional de-emphasized links, and then completing multiple pages of what appears to by a typical post-cancellation survey, but is actually required to effectuate cancellation. ExpressVPN's cancellation process is intentionally difficult to navigate and complete in order to trap consumers into paying for recurring ExpressVPN Subscriptions that they do not want.

89.     **WHERE:** ExpressVPN's deceptive and unlawful subscription scheme is conducted through its website, mobile/tablet/desktop applications, and electronic communications with customers.

90.     **WHEN:** ExpressVPN has been engaging in its deceptive and unlawful subscription scheme for years, and the scheme is ongoing. For a specific example, ExpressVPN used its deceptive and unlawful subscription practices scheme when Plaintiff first enrolled in an ExpressVPN Subscription in May 2020, through ExpressVPN's acknowledgment and receipt emails sent to Plaintiff, and Plaintiff's unsuccessful attempt to cancel his ExpressVPN Subscription after learning that ExpressVPN had charged him for one or more unwanted automatic renewals sometime after May 2021. ExpressVPN uses the same or substantially similar deceptive and unlawful subscription practices scheme for all of its customers.

91.    **WHY:** ExpressVPN uses its deceptive and unlawful subscription scheme in order to trap ExpressVPN customers into paying for ExpressVPN Subscriptions that they do not want. As a direct result of this scheme, Defendant has successfully reaped tens of millions in unlawful charges at the expense of unsuspecting customers.

92.    **HOW:** ExpressVPN conducts its deceptive and unlawful practices scheme by making the material misrepresentations and omissions in violation of consumer protection law and the common law alleged in detail above.

## CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all ExpressVPN customers in Illinois (including customers of companies ExpressVPN acts as a successor to) who were automatically enrolled into and charged for at least one month of an ExpressVPN Subscription by Defendant at any time from the applicable statute of limitations period to the date of judgment (the "Class").

94.    As alleged throughout this Complaint, the Class's claims all derive directly from a single course of conduct by Defendant, Defendant has engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of Defendant, at law and in equity, for their knowledge and conduct in deceiving their customers. Defendant's conduct did not meaningfully differ among individual Class Members in its degree of care or candor, its actions or inactions, or in its false and misleading statements or omissions. The objective facts on these subjects are the same for all Class Members.

95.    Excluded from the Class are: Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative,

predecessor, successor, or assignee of Defendant. Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

96. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files his motion for class certification.

97. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Defendant. Plaintiff believes, however, that the Class encompasses thousands of consumers whose identities can be readily ascertained from ExpressVPN's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

98. The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

99. Plaintiff is an adequate class representative. Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by Defendant. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

100. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

101.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Defendant's conduct violates the Illinois ARL;

      b.   Whether Defendant's conduct violates the applicable Illinois consumer protection statutes;

      c.   Whether Defendant's conduct violates the applicable common law doctrines;

      d.   Whether Defendant was unjustly enriched as a result of its conduct;

      e.   Whether Class Members have been injured by Defendant's conduct;

      f.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

      g.   The extent of class-wide injury and the measure of damages for those injuries.

102.    A class action is superior to all other available methods for resolving this controversy because: (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct; (3) Defendant has acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

103.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

      a.   Whether Defendant's conduct violates the Illinois ARL;

b.  Whether Defendant's conduct violates the applicable Illinois consumer protection statutes;

c.  Whether Defendant's conduct violates the applicable common law doctrines;

d.  Whether Defendant was unjustly enriched as a result of its conduct;

e.  Whether Class Members have been injured by Defendant's conduct; and

f.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

104.  Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

## <u>COUNT I</u>

**ILLINOIS AUTOMATIC CONTRACT RENEWAL ACT, 815 ILCS 601/1 *et seq.***

105.  Plaintiff incorporates by reference all preceding and subsequent paragraphs.

106.  Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

107.  The Illinois ARL requires that companies that sell or offer to sell any products or services to a consumer pursuant to a contract that automatically renews unless the consumer cancels the contract to disclose the automatic renewal offer terms clearly and conspicuously in the contract before the subscription or purchasing agreement is fulfilled and in visual proximity to the request for consent to the offer, and to not charge consumers for any payments in connection with such a contract without first obtaining the consumer's consent. 815 ILCS 601/10(a)(i)–(ii).

108.  At the time Plaintiff enrolled in an ExpressVPN Subscription, the Illinois ARL required companies like ExpressVPN to "disclose the automatic renewal clause clearly and conspicuously in the contract, including the cancellation procedure." 815 ILCS 601(a) (West 2004).

109.     Beginning in 2022, the Illinois ARL required that any covered entity provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or another cost-effective, timely, and easy-to use mechanism for cancellation. 815 ILCS 601/10(b-5) (West 2021).

110.     ExpressVPN violated the Illinois ARL as described in detail above, by:

    a.     Failing to clearly and conspicuously disclose the automatic renewal clause clearly and conspicuously in the contract;

    b.     During the Class Period, failing to obtain consumers' affirmative consent to the automatic renewal offer terms before charging consumers for ExpressVPN Subscriptions;

    c.     During the Class Period, failing to provide an acknowledgement that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel; and

    d.     Failing to provide a cost-effective, timely, and easy-to-use mechanism for cancellation.

111.     Plaintiff and Class Members suffered monetary damages as a result of Defendant's conduct.

112.     Defendant is liable to Plaintiff and Class Members for actual damages sustained.

## COUNT II

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

113.     Plaintiff incorporates by reference all preceding and subsequent paragraphs.

114.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

115.     815 ILCS § 505/1 *et seq.* (the "ICFA") prohibits "unfair methods of competition and unfair or deceptive acts or practices," including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

116. ExpressVPN committed unlawful practices under the ICFA because violations of the Illinois ARL constitute unlawful practices under the ICFA. 815 ILCS § 601/15.

117. ExpressVPN committed unfair and/or deceptive practices under the ICFA because it imposed charges without complying with all applicable requirements of 815 ILS § 601/1 *et seq.*, as alleged above.

118. ExpressVPN committed unfair and/or deceptive practices under the ICFA because it falsely misrepresents to consumers that when they purchase an ExpressVPN Subscription they will receive free additional months of the subscription, but in fact ExpressVPN charges consumers the same price for those purportedly "free" months as the non-"free" months in the ExpressVPN Subscription.

119. The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous.

120. Defendant's actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Class Members.

121. As a result of Defendant's unlawful, unfair, and deceptive business practices, Plaintiff and Class Members suffered monetary damages.

122. Plaintiff and Class Members seek relief under 815 ILCS § 505/10a, including, but not limited to injunctive relief, damages, restitution, punitive damages and attorneys' fees and costs.

## **COUNT III**

## **CONVERSION**

123. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

124. Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

125.    Plaintiff and the Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

126.    Defendant substantially interfered with Plaintiff's and the Class's possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for ExpressVPN Subscriptions.

127.    Plaintiff and the Class never consented to Defendant's taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

128.    Defendant wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

129.    Plaintiff and the Class have been damaged by Defendant's wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendant's records.

130.    By reason of the foregoing, Defendant is liable to Plaintiff and the Class for conversion in an amount to be proved at trial.

## COUNT IV

### UNJUST ENRICHMENT

131.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

132.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

133.    As a result of their unjust conduct, Defendant has been unjustly enriched.

134.    By reason of Defendant's wrongful conduct, Defendant has benefited from receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

135.    As a result of Defendant's conduct it would be unjust and/or inequitable for Defendant to retain the benefits of its conduct without restitution to Plaintiff and the Class. Accordingly, Defendant must account to Plaintiff and the Class for its unjust enrichment.

## COUNT V

## MONEYS HAD AND RECEIVED

136.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

137.    Plaintiff brings this claim on their own behalf and on behalf of each member of the Class.

138.    Defendant received moneys from Plaintiff and from each member of the Class.

139.    The moneys belong to Plaintiff and each member of the Class.

140.    Defendant has not fully returned the moneys.

141.    Plaintiff, on behalf of himself and the members of the Class, seeks the return of the moneys in an amount to be proved at trial.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 ILCS § 505/10a(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Class defined above, appointing Plaintiff as the Class representative, and designating Wittels McInturff Palikovic as Class Counsel;

(b)    Find that Defendant has committed the violations of law alleged herein;

(c)     Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(d)     Enter an order granting all appropriate relief including injunctive relief on behalf of the Class under the applicable laws;

(e)     Render an award of compensatory damages of at least $50,000,000, the exact amount of which is to be determined at trial;

(f)     Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(g)     Declare that Defendant has committed the violations of law alleged herein;

(h)     Render an award of punitive damages;

(i)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.

Dated: July 16, 2025

**WITTELS MCINTURFF PALIKOVIC**

/s/ Daniel J. Kieselstein
Daniel J. Kieselstein
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:     (914) 775-8862
djk@wittelslaw.com

*Counsel for Plaintiff and the Proposed Class*