## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**CHARLES GREENWOOD**,

On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

**EXPRESS TECHNOLOGIES LTD. f/k/a EXPRESS VPN INTERNATIONAL LTD.**,

Defendant.

Case No. 1:25-cv-08121

Hearing Date:  December 18, 2025
Time:  9:30 AM Central Time
Action Filed:  July 16, 2025
Judge:  Hon. Jorge L. Alonso
Trial Date:  None set

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12 MOTION TO DISMISS THE FAC AND, IN THE ALTERNATIVE, TO COMPEL ARBITRATION

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

    A.    ExpressVPN Provides VPN and Privacy Services ..................................................... 1

    B.    Plaintiff Repeatedly Received Notice of Automatic Renewal ................................... 2

    C.    The Operative ExpressVPN TOS Reiterate the Automatic Renewal Terms
        and Require Binding Arbitration ............................................................................... 4

ARGUMENT ........................................................................................................................... 5

I.     THE COURT SHOULD DISMISS FOR LACK OF PERSONAL
      JURISDICTION .............................................................................................................. 5

II.    ALTERNATIVELY, THE COURT SHOULD COMPEL ARBITRATION ..................... 8

III.   PLAINTIFF ALSO FAILS TO STATE A CLAIM .......................................................... 10

    A.    Plaintiff's IACRA Claim Fails Because There Is No Private Right of
        Action ........................................................................................................................ 10

    B.    Plaintiff's ICFA Claim Fails Because He Does Not Allege Unfair or
        Deceptive Conduct or Actual Pecuniary Loss .......................................................... 10

    C.    Plaintiff's Conversion Claim Fails Because He Seeks Only Payment of
        Money and Fails to Allege He Demanded Its Return Before Filing Suit ............. 13

    D.    Plaintiff Fails to State Unjust Enrichment & Money Had and Received
        Claims ....................................................................................................................... 14

    E.    In Any Event, Equitable Relief is Unavailable ........................................................ 15

    F.    In Any Event, Laches Bars Plaintiff's Recovery of his May 2024 Payment ......... 15

CONCLUSION ........................................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*,
   480 U.S. 102 (1987),....................................................................................................8

*be2 LLC v. Ivanov*,
   642 F.3d 555 (7th Cir. 2011) ........................................................................................7

*Beardsall v. CVS Pharmacy, Inc.*,
   953 F.3d 969 (7th Cir. 2020) ......................................................................................11

*Benson v. Fannie May Confections Brands, Inc.*,
   944 F.3d 639 (7th Cir. 2019) ................................................................................13, 14

*Bighorn Cap., Inc. v. 1000 SMA, LLC*,
   2006 WL 897747 (N.D. Ill. Mar. 30, 2006)................................................................15

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ......................................................................................12

*Calder v. Jones*,
   465 U.S. 783 (1984) ......................................................................................................6

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) ......................................................................................12

*CSI Worldwide, LLC v. TRUMPF, Inc.*,
   2025 WL 2522740 (N.D. Ill. Sept. 2, 2025) ...............................................................14

*Domer v. Menard, Inc.*,
   116 F.4th 686 (7th Cir. 2024) .......................................................................................9

*Fandel v. Allen*,
   398 Ill. App. 3d 177 (3d Dist. 2010) ..........................................................................10

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ......................................................................................................8

*Kim v. Carter's Inc.*,
   598 F.3d 362 (7th Cir. 2010) ......................................................................................13

*Mayle v. Urb. Realty Works, LLC*,
   2022 IL App (1st) 210470.......................................................................................13, 14

*Mouloki v. Epee*,
   262 F. Supp. 3d 684 (N.D. Ill. 2017) ........................................................................14

*Nicholas v. Amacon.com, Inc.*,
   2025 WL 2830693 (W.D. Wash. Oct. 6, 2025) ........................................................10

*Odle v. GameStop Corp.*,
   774 F. Supp. 3d 982 (S.D. Ill. 2025) ........................................................................11

*Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) ........................................................................12

*Page v. Alliant Credit Union*,
   2021 WL 168816 (N.D. Ill. Apr. 29, 2021),
   *aff'd,* 52 F.4th 340 (7th Cir. 2022) ........................................................................14

*PNC Bank, Nat'l Ass'n v. Kusmierz*,
   2022 IL 126606, 193 N.E.3d 1196 (2022) ........................................................................15

*Pomaranski v. Chicago Prime Packers, Inc.*,
   2024 WL 3950315 (N.D. Ill. Aug. 27, 2024) ........................................................................14

*Rogers v. City of Hobart*,
   996 F.3d 812 (7th Cir. 2021) ........................................................................5

*Rose v. Mercedes-Benz USA, LLC*,
   2023 WL 8544143 (N.D. Ill. Dec. 11, 2023) ........................................................................9

*Santiago v. Tesla, Inc.*,
   757 F. Supp. 3d 831 (N.D. Ill. 2024) ........................................................................11

*Schroder v. Teufel*,
   2017 WL 5569758 (N.D. Ill. Nov. 20, 2017) ........................................................................9

*Telemedicine Sols. LLC v. WoundRight Techs., LLC*,
   27 F. Supp. 3d 883 (N.D. Ill. 2014) ........................................................................6

*Thomas v. Walmart Inc.*,
   *720 F. Supp. 3d 650 (N.D. Ill. 2024)* ........................................................................6

*Thrasher-Lyon v. Illinois Farmers Ins. Co.*,
   861 F. Supp. 2d 898 (N.D. Ill. 2012) ........................................................................10, 11

*Turner v. GAC Star Quality, LLC*,
   671 F. Supp. 3d 897 (N.D. Ill. 2023) ........................................................................10

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ........................................................................4

*Zurich Am. Ins. Co. v. Watts Indus.*,
    466 F.3d 577 (7th Cir. 2006) ........................................................................................8

## **Rules/Statutes**

FRCP 12(b)(2) .................................................................................................................5

FRCP 12(b)(6) ...............................................................................................................10

815 ILCS 505/10a...........................................................................................................15

815 ILCS 601/15.............................................................................................................10

815 ILCS 601/10(a)(i) ....................................................................................................11

Illinois Consumer Fraud Deceptive Business Practices Act ...................................1, 10,  12, 13,  15

Illinois's Automatic Contract Renewal Law................................................. 1, 10, 11, 12

## **Other Authorities**

*International Dispute Resolution Procedures*, Art. 21,
    www.icdr.org/sites/default/files/document_repository/ICDR_Rules_1.pdf
    (Mar. 1, 2021) ............................................................................................................9

## INTRODUCTION

Plaintiff Charles Greenwood brings claims against Defendant Express Technologies Ltd. ("ExpressVPN") under Illinois's Automatic Contract Renewal Act ("IACRA"), Consumer Fraud Deceptive Business Practices Act ("ICFA"), and common law on the alleged basis that he did not know that the ExpressVPN virtual private network ("VPN") subscription he purchased would automatically renew. Plaintiff's claims cannot be reconciled with ExpressVPN's clear and conspicuous disclosures—including that the subscription would be "billed every 12 months"—and the fact that a VPN is, by its very nature, a service consumers generally use on an ongoing basis. Merits aside, plaintiff's claims do not belong in this Court and should be dismissed.

*First*, the Court lacks personal jurisdiction over ExpressVPN, a foreign company whose exceedingly limited contacts with Illinois did not give rise to plaintiff's claims. Controlling precedent makes clear that neither plaintiff's Illinois residence nor ExpressVPN's online ads (which did not specifically target Illinois) do not give rise to personal jurisdiction.

*Second*, plaintiff agreed to resolve any claims against ExpressVPN in arbitration, including any threshold disputes as to arbitrability. Accordingly, to the extent the Court exercises personal jurisdiction, it should do so only to compel plaintiff's claims to arbitration.

*Third*, plaintiff fails to state a claim for relief for the reasons below. Foremost among those reasons is that plaintiff's own complaint demonstrates that the autorenewing nature of the VPN services was repeatedly, explicitly, and clearly disclosed to him.

## BACKGROUND

### A. ExpressVPN Provides VPN and Privacy Services

ExpressVPN is a British Virgin Islands ("BVI") company. FAC ¶ 28. It is an established provider of online privacy and security solutions, including its flagship VPN subscription service. *See* Declaration of Jack Buckley ¶¶ 4-5 ("Buckley Decl."). A VPN uses software to encrypt users'

1

internet connections and provide a secure connection between users' devices and the internet. *See id.* ¶ 5. Often used by employers and organizations to enable remote employees to securely access enterprise networks across the globe, VPNs are also used by individuals around the world for their everyday internet browsing. *Id.* ¶ 8. ExpressVPN's VPN service is available entirely online without the need for any hardware or tangible product. *Id.* ¶ 9.

**B.      Plaintiff Repeatedly Received Notice of Automatic Renewal**

**1.      ExpressVPN Repeatedly Discloses the Automatic Renewal Terms**

When plaintiff purchased his subscription, he clicked through the ExpressVPN checkout process, which he partially depicts in his complaint.[1] FAC ¶ 44. On the first page of the checkout flow, the user selects among three autorenewing plans: (i) "1 Month . . . $12.95/mo . . . Billed $12.95 ***every month***;" (ii) "2 Years + 4 Months FREE . . . $4.99/mo . . . Billed $139.72 for 28 Months, ***then renews yearly***;" and (iii) "12 Months + 3 Months FREE . . . $6.67/mo . . . Billed $99.95 for 15 Months, ***then renews yearly***." *Id.*[2] The user is then brought to a second page with two steps: "Step 1 Enter your email address" and "Step 2 Select payment method." *Id.* ¶ 50. At "Step 2," upon selecting a payment method, the Terms of Service ("TOS") and automatic renewal terms are disclosed immediately above the "Subscribe now" button:

> By clicking below, I agree I have reviewed and consent to the <u>Terms of Service</u> and <u>Privacy Policy</u>.
>
> Subscription will renew **on an annual basis** on Nov 10, 2027, at the then-current rate **(now $116.95/year)** to the same credit card, Unless [*sic*] you cancel by going to the Subscription Tab under My Account and following the 'Cancel' prompts.

---

[1]    Plaintiff depicts the purported "current version" of ExpressVPN's website rather than the version in effect at the time of his purchase. The checkout flow in operation on May 23, 2022, when Plaintiff alleges he subscribed (for a third time), is appended to Mr. Buckley's Declaration and shows that ExpressVPN also repeatedly, explicitly, and clearly disclosed the autorenewing nature of its subscriptions at that time. *See* Buckley Decl., Ex. 1.

[2]    All emphases are added unless otherwise indicated.

*Id*. ¶ 51 (emphases in original). "Terms of Service" and "Privacy Policy" are underlined in green text on a contrasting white background with hyperlinks to the TOS and Privacy Policy. *Id*.

After making a purchase, the user receives an acknowledgment email that reiterates the autorenewing nature of the subscription—for example: "PRICE . . . 99.95 USD *billed every 12 months* . . . *RENEWAL DATE* . . . January 31, 2024." *Id*. ¶ 60.

### 2. Plaintiff Purchased Subscriptions in 2020, 2021, and 2022

On May 23, 2022, plaintiff purchased a yearly subscription to ExpressVPN and paid the annual fee of $99.95 for his first year. *Id*. ¶ 77. This was plaintiff's *third* ExpressVPN subscription in as many years—he concedes he purchased "prior subscriptions" (plural) in "2020 and 2021," which "did not renew because [his] payment method had expired." *Id*. ¶92. Thus, plaintiff's assertion that, when he purchased his *third* subscription in three years, he did not "know[] that he was enrolling in an automatically renewing subscription," *id*. ¶ 76, would require the Court to infer that plaintiff: (i) somehow missed, for the third time, ExpressVPN's repeated and explicit disclosures of autorenewal in the checkout flow and email receipt; (ii) allegedly did not want an autorenewing subscription, yet he consistently signed back up when his service was interrupted due to an expired payment method in 2021 and 2022; and, relatedly, (iii) noticed "the first unauthorized charge to [his] credit card in May 2023," *id*. ¶ 82, but was "unable to cancel the subscription" for *over two years*, until June 2025, *id*. ¶¶ 82-83, while inexplicably failing to contact ExpressVPN to cancel his subscription and request a refund.

Plaintiff alleges that ExpressVPN's stylistic choices of font colors and sizes are to blame for his confusion, *id*. ¶¶ 51-54—but his characterizations are contradicted both by his own selectively excerpted images of ExpressVPN's webpages as well as by the full pages in their original context. *See id*. ¶¶ 44, 50-51; *cf*. Buckley Decl., Ex. 1 (May 23, 2022). For instance, the

size of the text "Billed $12.95 every month," "Billed $139.72 for 28 Months, then renews yearly," and "Billed $99.95 for 15 Months, then renews yearly" was the same size as other important notices, including "30-day money-back guarantee," "All amounts shown are in USD," and "I can unsubscribe anytime, and my information will not otherwise be shared, as per the Privacy Policy," *cf.* Buckley Decl., Ex. 1—none of which plaintiff asserts were obscured.[3]

Although plaintiff reluctantly admits that, before an order can be placed, the "terms and conditions of ExpressVPN's automatic renewal are at last disclosed to the consumer," he complains that such disclosures are "in tiny gray font atop a similarly colored background."  FAC ¶ 51.  However, this disregards the clearly white (not "similarly colored") background and that such "gray font" was used abundantly, including for key fields (*e.g.*, "Your email address," "First Name," "Last Name," "Card Number") and even for emphasizing that discounted rates were a significant drop from the usual price, which for comparison were in gray and crossed out (*e.g.*, "$310.8"), *id.* ¶¶ 50-51, belying the suggestion that the use of such text was intended to obscure.

## C.    The Operative ExpressVPN TOS Reiterate the Automatic Renewal Terms and Require Binding Arbitration

At all relevant times, including when plaintiff chose to renew his subscription for a third time on May 23, 2022, ExpressVPN's checkout page required a customer's assent to the TOS before purchasing a VPN subscription.  *See, e.g.*, Buckley Decl., Ex. 1 (May 23, 2022); FAC ¶ 51. Those TOS, which were directly hyperlinked on the checkout page and were available at www.expressvpn.com/tos and www.express-vpn.com, set forth the automatic renewal,

---

[3]   The complete versions of the ExpressVPN webpages and documents that plaintiff heavily relies on in the FAC, including the alleged present day ExpressVPN ads and checkout flow, *see* FAC ¶¶ 16-22, 44-51, are incorporated therein by reference and may be considered by the Court at the motion to dismiss stage.  *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim.").

cancellation, and dispute resolution terms—including a binding arbitration agreement—applicable to ExpressVPN subscriptions.  Buckley Decl., Ex. 2 §§ 4, 15.

Section 4 of the TOS stated that, "When supported by your payment method, *plans renew automatically by default* at the completion of the billing term," "The subscription *fee will be charged automatically* to the payment method you last selected," and "*By default, auto-renewal is turned on*."  Buckley Decl., Ex. 2 § 4.  It also explained that, with respect to cancellation, "to discontinue automatic renewal [customers] may sign in to the Site and turn off auto-renewal or email [ExpressVPN] at support@expressvpn.com," *id.*, which complemented the notice in the order acknowledgment email, "Need help? Chat with Support or reply to this email."  FAC ¶ 60.  Section 15 of the TOS requires that, "All disputes arising out of or relating to this Agreement or the use of the Site or Services shall be finally settled under the Rules of Arbitration ('Rules') of the International Centre for Dispute Resolution (ICDR) by one arbitrator ('Arbitrator') appointed in accordance with said Rules."  Buckley Decl., Ex. 2 § 15.

## **ARGUMENT**

### I.  **THE COURT SHOULD DISMISS FOR LACK OF PERSONAL JURISDICTION**

The Court should dismiss the FAC under FRCP 12(b)(2) because it lacks personal jurisdiction over ExpressVPN—a foreign company not "at home" in Illinois.  To exercise specific personal jurisdiction, the Court must find that: "(1) [ExpressVPN] . . . purposefully directed [its] activities at [Illinois]; (2) the alleged injury arises out of or relates to [such] activities; and (3) the exercise of personal jurisdiction . . . comport[s] with traditional notions of fair play and substantial justice."  *Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2021).  This analysis fails.

"The Seventh Circuit has distilled from the Supreme Court's analysis in *Calder [v. Jones*, 465 U.S. 783 (1984)] a three-pronged 'express aiming' test for personal jurisdiction in the context of intentional torts: '(1) intentional conduct . . . ; (2) expressly aimed at the forum state; (3) with

the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state.'" *Telemedicine Sols. LLC v. WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 893 (N.D. Ill. 2014). Although plaintiff points to three categories of purported jurisdictional "evidence," he has not and cannot make the required *Calder* showings.

*First*, plaintiff asserts that "ExpressVPN ran ads including the keyword 'Chicago'" and has webpages titled "Best VPN for Illinois" and "Best Chicago VPN servers." FAC ¶¶ 17-21. Plaintiff's reliance on these materials is misplaced. His allegation regarding Google ads does not specify what, if any, search terms a user had to use along with "Chicago" to supposedly see an ExpressVPN ad. *Id.* ¶ 21. Such a vague assertion about user-initiated web searches has no bearing on whether ExpressVPN *itself* created sufficient Illinois contacts. *See Walden v. Fiore*, 571 U.S. 277, 277 (2014) ("The plaintiff cannot be the only link between the defendant and the forum.").

Furthermore, the two ExpressVPN webpages did not exist when plaintiff signed up on May 23, 2022, Buckley Decl. ¶¶ 21-22, and therefore cannot confer personal jurisdiction over ExpressVPN as to its alleged conduct on that date. *Cf. Thomas v. Walmart Inc.*, 720 F. Supp. 3d 650, 661 (N.D. Ill. 2024) ("[S]pecific personal jurisdiction must independently exist for each claim." (cleaned up)). Even if they had existed at the time, these webpages bear no—or at most, incidental—indicia of "targeting Illinois consumers," as plaintiff contends. FAC ¶ 22. In context, ExpressVPN's advertising instead conveys that it offers access to thousands of VPN servers in hundreds of locations around the world—with Illinois and its cities merely serving as examples—each selectable by a global audience from *anywhere in the world*, inside or outside of Illinois:

> Best VPN for Illinois . . . Get a secure U.S. IP across *all 50 states* .
> . . ExpressVPN has *servers in all 50 U.S. states* . . . Choose a VPN
> server location *in any of 105 countries and 50 U.S. states* . . . *From
> coast to coast,* get the IP you need . . . ExpressVPN users can
> connect to server locations *in 105 countries and counting*. You can

> access **any of these locations** from Illinois **or anywhere else in the world.**

*Id.* ¶¶ 17-18 & n.4.

> Best Chicago VPN servers . . . #1 Trusted VPN . . . **Best for the U.S.** . . . Browse privately **from coast to coast across 50 U.S. states** . . . Get an IP address in Chicago **or a VPN server location in any of 105 countries** . . . ExpressVPN users can connect to server locations **in 105 countries and counting**. You can access **any of these VPN server locations** from Chicago **or anywhere else in the world.**

*Id.* ¶ 19 & n.7. Put differently, when ExpressVPN says it is the "Best VPN for Illinois" or has the "Best Chicago VPN servers," the plain meaning conveyed is that it is the "best" **for remotely accessing** servers in those locations, which—by definition given the nature of a VPN service—is disconnected from a user's physical location, which is anywhere in the world by design.

At most, plaintiff alleges only that ExpressVPN operates an "interactive website" accessible by Illinois consumers (and everyone else in the world). FAC ¶ 16. But where a "defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then [that] defendant may not be haled into court in that state without offending the Constitution." *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011) (cleaned up). So, too, here. ExpressVPN ads that plaintiff could not have seen when signing up do not constitute the requisite "minimum contacts."

**Second**, plaintiff alleges that ExpressVPN has "servers located in Illinois." FAC ¶ 16. Plaintiff appears to be referring to the servers that host the ExpressVPN's service (the "VPN Servers"). But the location of VPN servers (around the world) is irrelevant because plaintiff's claims do not arise out of or relate to Illinois-based VPN Servers. Indeed, he does not even allege that he selected or used an Illinois-based VPN Server. Instead, he complains about the content of ExpressVPN's consumer-facing **websites**, which are hosted on separate servers (the "Website

Servers"), the location of which is determined not by ExpressVPN but rather by its "third-party webhosting service provider hired . . . to host the websites such that they are accessible globally." Buckley Decl. ¶ 19. Plaintiff does not allege that any Website Servers are located in Illinois.

**Third**, plaintiff alleges that, "[p]otential customers are directed to ExpressVPN's website through . . . its sponsorship of influencers," including "on numerous podcasts." FAC ¶ 3. This bare and conclusory allegation—unrelated to Illinois—carries no weight. But "[t]o the extent, if any, that an affiliate were to advertise to a particular location, that would be fully within the discretion and control of the affiliate, not ExpressVPN." Buckley Decl. ¶ 18. Such "unilateral activity of . . . **a third person** is not an appropriate consideration when determining" minimum contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984).

Furthermore, even if relevant minimum contacts existed (they do not), exercising jurisdiction over ExpressVPN would be unreasonably burdensome because it is a BVI company with no offices anywhere in the U.S. Buckley Decl. ¶ 3; *see Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

## II.   ALTERNATIVELY, THE COURT SHOULD COMPEL ARBITRATION

If the Court concludes it has personal jurisdiction over ExpressVPN, it should compel arbitration in accordance with the parties' agreement to arbitrate. *See* Buckley Decl., Ex. 2 § 15. "To compel arbitration, a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Zurich Am. Ins. Co. v. Watts Indus.*, 466 F.3d 577, 580 (7th Cir. 2006). Plaintiff alleges that he subscribed (once again) to ExpressVPN in May 2022. FAC ¶ 77. At that time, ExpressVPN's TOS contained an arbitration clause to which plaintiff affirmatively consented to

be bound when he completed the checkout process. Buckley Decl. ¶ 12. Courts in this Circuit routinely enforce consumer arbitration agreements under such circumstances. *See, e.g.*, *Domer v. Menard, Inc.*, 116 F.4th 686, 694-99 (7th Cir. 2024) ("[Defendant] has shown that (1) its website provided reasonably conspicuous notice of the terms . . . and (2) [plaintiff's] click of the button 'SUBMIT ORDER' unambiguously manifested her assent to those terms. . . . So, the arbitration agreement was formed."); *Rose v. Mercedes-Benz USA, LLC*, 2023 WL 8544143, at *3 (N.D. Ill. Dec. 11, 2023) ("[P]roviding actual notice to its customers of the TOS Agreement, where to locate it, and then following up with a . . . Welcome Email containing a link to [it].").[4]

The parties' arbitration agreement is governed by the ICDR Rules, Buckley Decl., Ex. 2 § 15, which provide that, "The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to arbitrability, [or] to the existence, scope, or validity of the arbitration agreement(s) . . . without any need to refer such matters first to a court," and the arbitration clause "shall be treated as an agreement independent of the other terms of the contract." ICDR, *International Dispute Resolution Procedures*, Art. 21(1)-(2), www.icdr.org/sites/default/ files/document_repository/ICDR_Rules_1.pdf (Mar. 1, 2021). Such incorporation of the ICDR Rules by reference "qualifies as a clear and unmistakable expression of the parties' intent to leave the question of the arbitration clause's validity to the arbitrator" and therefore mandates that even threshold arbitrability questions in this matter be sent to the arbitrator. *Schroder v. Teufel*, 2017 WL 5569758, at *4 (N.D. Ill. Nov. 20, 2017) (analogous AAA rules).

---

[4]  Plaintiff may argue that a later version of the TOS governs part or all of this dispute because the terms provide: "ExpressVPN may update the [TOS] from time to time without notice. If you continue to use ExpressVPN Services . . . after these changes take effect, then you agree to the revised [TOS]." Buckley Decl., Ex. 2 § 2. But to make that argument, plaintiff would first have to allege that he continued to use the VPN service during the autorenewal period he claims was unwanted. He makes no such allegation and therefore the May 2022 arbitration agreement applies.

## III.     PLAINTIFF ALSO FAILS TO STATE A CLAIM

Even if the Court were to determine that it has jurisdiction and that all or some of plaintiff's claims are exempt from arbitration, it should dismiss for failure to state a claim per FRCP 12(b)(6).

### A.     Plaintiff's IACRA Claim Fails Because There Is No Private Right of Action

IACRA contains no express private right of action, as the legislature explicitly provided instead that a "violation of [IACRA] constitutes an unlawful practice under the [ICFA]." 815 Ill. Comp. Stat. Ann. ("ILCS") 601/15. IACRA does not contain an implied private right of action either, as such a right "exists 'only in cases where the statute would be ineffective . . . unless such action were implied.'" *Turner v. GAC Star Quality, LLC*, 671 F. Supp. 3d 897, 903–04 (N.D. Ill. 2023). That is not the case here, because relief for violations of IACRA exists through ICFA. *See Nicholas v. Amacon.com, Inc.*, 2025 WL 2830693, at *3 (W.D. Wash. Oct. 6, 2025) ("IACRA simply does not include a private right of action but instead 'constitutes an unlawful practice under' ICFA.").[5] Plaintiff's standalone IACRA claim must therefore be dismissed as a matter of law.

### B.     Plaintiff's ICFA Claim Fails Because He Does Not Allege Unfair or Deceptive Conduct or Actual Pecuniary Loss

In Count II, plaintiff asserts both a standalone "unfair or deceptive" ICFA claim and a per se ICFA claim predicated on IACRA violations. FAC ¶¶ 123-25. Both theories fail. With respect to the standalone ICFA claim, plaintiff fails to allege "***an unfair or deceptive act or practice by the defendant***." *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 908–09 (N.D.

---

[5]  Although Illinois courts have yet to rule on this question, they have held that no private right of action exists under analogous statutes. *See Fandel v. Allen*, 398 Ill. App. 3d 177, 187-88 (3d Dist. 2010) ("[T]he Home Repair Act [("HRA")] . . . provides that 'any violation of this Act shall constitute a violation of the [ICFA].' . . . It is clear . . . that the legislature did not intend to provide homeowners with a private right of action under the [HRA].); *see also Turner*, 671 F. Supp. 3d at 904 ("The Repair Act designates repeat violations of its provisions as unlawful practices under the ICFA . . . . Because these remedies are more than adequate to accomplish the statute's regulatory objectives, no private right of action is needed.").

Ill. 2012). This "allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff," *Santiago v. Tesla, Inc.*, 757 F. Supp. 3d 831, 840 (N.D. Ill. 2024), where a "reasonable consumer standard is used to determine if deception has occurred," *Beardsall v. CVS Pharmacy, Inc.,* 953 F.3d 969, 973 (7th Cir. 2020). "This standard requires a probability 'that a significant portion of the general consuming public . . . , acting reasonably . . . , could be misled.'" *Odle v. GameStop Corp.,* 774 F. Supp. 3d 982, 998 (S.D. Ill. 2025). Plaintiff's own pleading confirms no unfair or deceptive conduct occurred here, much less conduct that would have misled a reasonable consumer, as ExpressVPN presented him with numerous explicit disclosures of the automatic renewal terms each of the (at least) three times he subscribed. *See* BACKGROUND §§ B-C, *supra*. Rather than face this reality, plaintiff conjures "deception" where none exists—for example:

• **Placement of disclosures:** Plaintiff alleges that, "ExpressVPN waits until a customer reaches the payment step in its sign-up process and then buries a purported (and inadequate) 'disclosure' regarding its recurring fees in a drop-down feature designed in a way such that customers overlook it." FAC ¶ 9. But this seeks to penalize ExpressVPN for its ***compliance*** with the IACRA requirement that the terms be disclosed "***in visual proximity . . . to the request for consent to the offer***." 815 Ill. Comp. Stat. Ann. 601/10(a)(i). Indeed, the disclosures are dynamically displayed when the user selects a payment method so as to be immediately next to the "Subscribe now" button and therefore visually unavoidable during the checkout process.

• **Cancellation methods:** Plaintiff complains of a "six layer[] deep" cancellation process and the lack of a "toll-free number or electronic mail address for consumers to cancel," FAC ¶¶ 64, 74, but these allegations are immaterial given plaintiff does not assert these circumstances existed when he tried to cancel his subscription in May 2023. FAC ¶ 82. Furthermore, at all times

from 2023 to 2025 (at minimum), ExpressVPN *did* provide its contact information for users to cancel, including the email address listed in the TOS and the chat function that—as illustrated in the FAC—was linked to in the order acknowledgment email.  *Id*. ¶ 60; Buckley Decl., Ex. 2.[6]

- **Free months:**  Plaintiff premises his ICFA claim in part on the allegation that the current language "2 Years + 4 Months FREE" in the ExpressVPN checkout flow "falsely misrepresents to consumers that when they purchase an ExpressVPN [s]ubscription they will receive free additional months . . . , but in fact ExpressVPN charges consumers the same price for those purportedly 'free' months as the non-'free' months."  FAC ¶¶ 48, 125.  This allegation is irrelevant because plaintiff does not allege that he selected this option or that the same or similar language existed when he purchased his subscription (it did not).

- **Generic "dark patterns":**  The FAC's seven pages spent critiquing a generic panoply of so-called "dark patterns" allegedly applicable to the entire "subscription e-commerce industry" underscores plaintiff's lack of valid claims of deception against ExpressVPN itself.  FAC ¶ 31.

Furthermore, plaintiff lacks statutory standing to assert any ICFA violation—whether standalone or a "per se" claim premised on an IACRA violation—because he does not sufficiently allege "the element of actual damages" which "requires that [he] suffer *actual pecuniary loss*."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014); *see Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514–15 (7th Cir. 2006) ("It is true that a violation of the Uniform Deceptive Trade Practices Act violates the ICFA, . . . but such violations do not automatically

---

[6]   Because the FAC discusses ExpressVPN's TOS, which govern the relationship between the parties, the TOS is integral to this dispute and is therefore suitable for incorporation by reference into the FAC.  *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment.").  Alternatively, the Court may take judicial notice of the TOS pursuant to ExpressVPN's Request for Judicial Notice.

entitle an individual to damages. . . . There is no per se violation that automatically makes [defendant] liable to [plaintiff] and the members of the proposed class for private damages.").

Plaintiff asserts he was injured "because had he known the truth about ExpressVPN's intentionally misleading subscription practices, he would not have enrolled in an ExpressVPN [s]ubscription." FAC ¶ 88. But this does not state an ICFA claim, as plaintiff does not thereby allege that ExpressVPN failed to provide the services purchased, that the services were deficient or worth less than the amount paid, or that he did not use the service during the autorenewal periods. *See, e.g.*, *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) ("[P]laintiff's allegation of actual damages fell short, even though he said that he 'would not have purchased' shirts absent deceptive advertising, because he had not alleged that he paid more than 'the actual value of the merchandise he received.'").

Indeed, plaintiff admits receiving precisely the benefit of his bargain—three years of ExpressVPN services in exchange for $216.90—exactly as advertised, no more, and no less. FAC ¶ 87; *cf. Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) ("[A]ctual loss may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the property.'"). Plaintiff's logistical frustrations with ExpressVPN do not magically transform a straightforward exchange of money for a service into the type of pecuniary *loss* required to state an ICFA claim. The ICFA claim should therefore be dismissed.

### C. Plaintiff's Conversion Claim Fails Because He Seeks Only Payment of Money and Fails to Allege He Demanded Its Return Before Filing Suit

To state a claim for conversion, a plaintiff must allege that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Mayle v. Urb. Realty*

*Works, LLC*, 2022 IL App (1st) 210470, ¶ 77.. "[A]s the Seventh Circuit has recognized, ***an asserted right to money normally will not support a claim for conversion*** . . . . [A]n action for the conversion of funds may not be maintained to satisfy ***a mere obligation to pay money*.**" *Pomaranski v. Chicago Prime Packers, Inc.,* 2024 WL 3950315, at *4 (N.D. Ill. Aug. 27, 2024). Because that is the exact relief plaintiff seeks, his conversion claim must be dismissed.

Additionally, plaintiff fails to allege that he "demanded the return of any property" from ExpressVPN, which he could have done at any time by requesting a refund. *Mayle*, 2022 IL App (1st) 210470, ¶¶ 77-78. "There are no allegations in the complaint as to when [a] demand was made, to whom it was made, or how it was made." *Id.* This is independently fatal to plaintiff's claim, as "[c]onversion claims indeed require plaintiffs to show that they demanded possession of the property." *Mouloki v. Epee*, 262 F. Supp. 3d 684, 699 (N.D. Ill. 2017).

### D. Plaintiff Fails to State Unjust Enrichment & Money Had and Received Claims

"Under Illinois law, there is no stand-alone claim for unjust enrichment." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019). "[U]njust enrichment is . . . a remedy that can flow from a contract implied in law." *CSI Worldwide, LLC v. TRUMPF, Inc.*, 2025 WL 2522740, at *9 (N.D. Ill. Sept. 2, 2025). But it is "unavailable" where, as here, "an express contract exists [*i.e.*, the TOS] concerning the underlying subject matter." *Id.* at *7. Plaintiff's unjust enrichment claim must be dismissed.

"A 'money had and received' claim is similar to a claim for unjust enrichment. . . . Like unjust enrichment, a claim for 'money had and received' is based on an implied contract or quasi-contract theory, not an express contract." *Page v. Alliant Credit Union*, 2021 WL 1688176, at *3 (N.D. Ill. Apr. 29, 2021) *aff'd,* 52 F.4th 340 (7th Cir. 2022). Like unjust enrichment, "moneys had and received" cannot be asserted against a contracting party. *Id.* ("Because the parties' relationship is based on the . . . Agreement, [plaintiff's] money had and received claim is without merit.").

14

### E.    In Any Event, Equitable Relief is Unavailable

Plaintiff requests restitution and injunctive relief within Counts II, IV, and V.  FAC ¶¶ 129, 142, 148.  But such "[e]quitable relief is not available if a party has an adequate remedy at law." *Bighorn Cap., Inc. v. 1000 SMA, LLC*, 2006 WL 897747, at *2 (N.D. Ill. Mar. 30, 2006).  Plaintiff fails to plead the inadequacy of legal remedies and, in any event, the "total of $216.90" he seeks for the allegedly improper ExpressVPN subscription fees, FAC ¶ 87, is plainly available as money damages under his ICFA claim, 815 ILCS  505/10a.  Equitable relief is therefore unavailable.

### F.    In Any Event, Laches Bars Plaintiff's Recovery of his May 2024 Payment

"Two elements must be established for *laches* to successfully defeat a claim: (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay." *PNC Bank, Nat'l Ass'n v. Kusmierz*, 2022 IL 126606, ¶ 26, 193 N.E.3d 1196, 1205–06 (2022).  Laches "may be determined on a motion to dismiss if its applicability is established on the face of the pleadings." *Id*.  Plaintiff alleges that he learned of "the first unauthorized charge to [his] credit card in May 2023" and then "searched for information on the internet about how to cancel." FAC ¶ 82.  Despite therefore indisputably having knowledge of the autorenewing charges in or about May 2023, and despite the fact that ExpressVPN's contact information is available in its TOS, on its website, and generally online, plaintiff did not seek to contact ExpressVPN to cancel his subscription or request a refund.  Instead, he sat on his hands for over *two years*, incurring additional charges—thereby more than doubling his damages, to ExpressVPN's detriment—knowing full well that he would be charged again each year.  Plaintiff's claim for damages arising out of his second renewal charge in May 2024 is thus barred by laches.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's claims must be dismissed or compelled to arbitration.

DATED: November 3, 2025

By /s/ Stephen A. Broome

Stephen A. Broome (Cal. Bar No. 314605)*
stephenbroome@quinnemanuel.com
John W. Baumann (Cal. Bar No. 288881)*
jackbaumann@quinnemanuel.com
Rex N. Alley (Cal. Bar Bo. 346525)*
rexalley@quinnemanuel.com
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
(*Admitted Pro Hac Vice)

Attorneys for Defendant

Nicolas G. Keller (N.Y. Bar No. 5549522)*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849 7000
Fax: (212) 849 7100
(*Admitted Pro Hac Vice)

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I, Stephen A. Broome, hereby certify that the foregoing document complies with Local Rule 7.1 because it is 15 pages long (excluding the caption, table of contents, table of authorities, and signature block) and with Local Rule 5.2(e) because it is typed in 12-point font and the text of the body is double-spaced.

DATED:  November 3, 2025

*/s/ Stephen A. Broome*
Stephen A. Broome